IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **NATIONAL ROOFING INDUSTRY PENSION PLAN, et. al.** | ) | |
| **PlaintiffS,** | ) | **Case No. 24-cv-1530-DWD** |
| **vs.** | ) | |
| **BELTRAN CONTRACTORS, LLC.** | ) | |
| **Defendant.** | ) | |

**MEMORANDUM AND ORDER**

**DUGAN, District Judge:**

Before the Court is the Plaintiffs' Motion for Summary Judgment. (Doc. 41). The parties have fully briefed the issues, and the Motion is ripe for consideration. For the reasons stated below, the Court will GRANT the Motion and enter judgment accordingly.

## BACKGROUND

Defendant, Beltran Contractors, LLC, was a party to a collective bargaining agreement executed on April 17, 2019, with United Union of Roofers, Waterproofers, and Allied Workers, Local Union No. 2, A.F.L.-C.I.O., ("Union") effective through February 28, 2022. ("CBA" or "Agreement"). The Agreement required Beltran to pay contributions to the National Roofing Industry Pension Plan ("NRIPP"), the Roofers and Waterproofers Research and Education Joint Trust Fund ("Education Fund") and the Roofers Local #2 Supplemental Pension Plan ("Local #2 Fund"), the Indiana State Council of Roofers Health and Welfare fund ("Health Fund"), and the United Union of Roofers and Allied

Workers, Apprentice Fund ("Roofer's Fund").[1] Contributions to these funds are based on all hours worked by employees covered by the CBA in its employment. (Doc. 39, Exh. 15; Hamilton Aff. ¶ 9).

The CBA also requires Beltran to submit monthly contribution report forms to the Funds showing the number hours worked for all employees covered by the CBA and calculations as to the contributions due to the Funds. To verify the contributions owed to the Funds, the CBA also provides that the Funds may conduct audits of any records of the employer. (Doc. 39, Exh. 15; Hamilton Aff. ¶ 13).

Certain provisions of the CBA are helpful in describing the responsibilities of the Employers to make contributions to each of the Plaintiff Funds. Article 13 of the CBA provides in pertinent part:

> In all cases where Employees are sent or are dispatched by Employer to supervise or perform work outside the territorial jurisdiction of the Union (as defined by its charter and the International), and said job site is within the territorial jurisdiction of any other sister local union of the Union herein, then, and in such event, the minimum hourly wage scale to be paid by the Employer to Employees dispatched outside of this jurisdiction for such work shall be either the regular working hourly wage scale for similar work in such geographical area, or the regular hourly wage scale provided for in this Agreement, whichever is greater.

Relevant for the Motion is Article 45 of the CBA which provides in relevant part:

> The contributions required by this Article shall accrue with respect to all hours worked by any Employee represented by the Union, or by any person doing work within the jurisdiction of the Union. *Said contributions shall accrue with respect to all hours worked by Employees, covered by the terms of this Agreement within or outside the geographical jurisdiction of the Union, except that*

[1] These parties will be referred to collectively as "Plaintiffs" unless otherwise indicated.

> *when work is performed outside the Union's jurisdiction where another fringe benefit fund of a similar kind exists and the Employer makes contributions to that fund, then said Employer shall not be required to make a contribution to this fund.*

Emphasis added.

Article 48 of the CBA provides for actual damages, liquidated damages, costs, attorneys fees and interest penalty relative to any unpaid and owing contributions to the funds. Article 48 also provides for regular and special audits and examinations of an employer's records to verify that proper contributions are being made.

It does not appear to be in dispute that Beltran signed the CBA with Roofers Local #2 on April 17th, 2019, to be effective through February 28, 2022. (Doc. 38-6, Jesus Beltran dep. p. 11; Doc. 41, ¶1). Rather the central dispute is Beltran's contention that the "most favored nation"[2] provision found in Article 7 of the CBA compels incorporation of the "more favorable" terms found in the Kehrer Brothers West ("KBW") CBA regarding the agreed upon territorial boundaries of the agreement. (Doc. 41, p. 23). Article 7 of the Beltran CBA provides, in pertinent part:

> All Employers, prior to performing work covered by this Agreement within the jurisdiction of Local No. 2, as set forth in Article 3, must be signatory to this Agreement. *Roofers Local Union No. 2 agrees that if, during the term of this Agreement, it enters into any collective bargaining agreement with any other Employer involving any of the work covered by this Agreement, . . . results in a collective bargaining agreement providing for the lower wages, longer hours, or for*

[2] The concept of "most favored nation" is one borrowed from those seen in the World Trade Organization's policy that required members to grant one another multilateral reciprocal privileges. Relevantly, an MFN "enables the employer to adopt more favorable terms, such as lower-cost wages or benefits, if the union subsequently grants those terms to another employer." At the same time "it ensures that the employer can remain competitive and is not disadvantaged by its labor costs relative to local industry competitors." Collective Bargaining Agreement: Most Favored Nation Clause, Practical Law Standard Clauses 5-527-1786.

> *any terms and conditions more favorable to a Signatory Employer than those described in this Agreement, any Employer who is party to this Agreement shall immediately have the benefit of such provision, . . . and the more favorable terms of such provision . . .shall automatically and immediately become part of this Agreement* and be in full force and effect, as if set forth in full in this Agreement, superseding any less favorable provisions of this Agreement.

Emphasis added.

Defendant argues that Article 3 of the KBW CBA contains more favorable conditions in that it limits the effective territory to the City of St. louis and several Counties in Missouri and Illinois. (Doc. 38-19, Art. 3). In pertinent part Article 3 provides:

> The territory covered by this Agreement shall consist of the following cities and counties in the State of Missouri, to-wit: City of St. Louis, County of St. Louis, Crawford County, Franklin County, Gasconade County, Jefferson County, Lincoln County, Marion County, Monroe County, Montgomery County, Pike County, Ralls County, St. Charles County, St. Francois County, Ste. Genevieve County, Shelby County, Warren County, and Washington County. In addition, the territory covered by this Agreement shall consist of the following counties in the State of Illinois, to-wit: Bond County, Calhoun County, Clinton County, Greene County, Jersey County, Southern Half of Macoupin County, Madison County, Monroe County, Southern Half of Pike County, Randolph County, St. Clair County, and Washington County.

Beltran contends that the most favored nation clause in Article 7 of the Beltran CBA would effectively require it make contributions only for work done within the City of St. Louis and the Missouri and Illinois Counties identified in Article 3 of the KBW CBA. (Doc. 41, p. 23). Beltran points to the several Articles contained in the KBW CBA that provide contributions are to be made only for employees covered by the agreement and for which it is "obligated to pay an employee covered by this collective agreement." (Doc.

41, p.23-25). More specifically, Beltran compares the corresponding operative terms within the Beltran and KBW CBAs. That comparison reveals nearly identical language in each corresponding relevant Article of the Beltran CBA and the KBW CBA except that in the latter each relevant article includes the phrase "as defined in Article 3". *Id.* So, according to Beltran, under the most-favored-nations provision contained in Article 7 of the Beltran CBA, the KBW CBA language automatically and immediately becomes part of, and as fully set forth in, the Beltran CBA. (Doc. 41, p. 26).

## Legal Standard

Summary judgment is proper if the movant shows that there is no genuine issue as to any material fact and they are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "Factual disputes are genuine only if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the evidence presented, and they are material only if their resolution might change the suit's outcome under the governing law." *Maniscalco v. Simon*, 712 F.3d 1139, 1143 (7th Cir. 2013) (citation and internal quotation marks omitted). In deciding a motion for summary judgment, the court must view the evidence in the light most favorable to, and draw all reasonable inferences in favor of, the non-moving party. *Apex Digital, Inc.*, 735 F.3d at 965 (citation omitted).

## Discussion

A. Interpretation and Construction

When the facts are undisputed, contract interpretation is a legal question. *In re Southwest Airlines Voucher Litigation,* 898 F.3d 740, 743–44 (C.A.7 (Ill.), 2018). "An agreement, when reduced to writing, must be presumed to speak the intention of the parties who signed it. It speaks for itself, and the intention with which it was executed must be determined from the language used. It is not to be changed by extrinsic evidence." *Air Safety, Inc. v. Teachers Realty Corp*., 706 N.E.2d 882, 884, 236 Ill.Dec. 8, 10, 185 Ill.2d 457, 462 (Ill.,1999); *Western Illinois Oil Co. v. Thompson*, 26 Ill.2d 287, 291, 186 N.E.2d 285 (1962). This approach is sometimes referred to as the "four corners" rule. See, e.g., *URS Corp. v. Ash*, 101 Ill.App.3d 229, 234, 56 Ill.Dec. 749, 427 N.E.2d 1295 (1981).

In applying this rule, a court initially looks to the language of a contract alone. See *Rakowski v. Lucente*, 104 Ill.2d 317, 323, 84 Ill.Dec. 654, 472 N.E.2d 791 (1984) (stating that both the meaning of a written agreement and the intent of the parties is to be gathered from the face of the document without assistance from extrinsic evidence). If the language of the contract is facially unambiguous, then the contract is interpreted by the trial court as a matter of law without the use of parole evidence. *Farm Credit Bank v. Whitlock*, 144 Ill.2d 440, 447, 163 Ill.Dec. 510, 581 N.E.2d 664 (1991). Collective bargaining agreements are construed using the same guidance. See *Chicago Regional Council of Carpenters Pension Fund v Schal Bovis, Inc*. 826 F. 3d 397, 406 (7th Cir. 2016)

In essence, Defendant's argument is that the KBW CBA provides for a much smaller geographical area than the Beltran CBA, and it views that difference as favorable to it. Beltran contends that Article 7 allows it to select from any of the favorable provisions

contained in the KBW CBA and those will be automatically incorporated into the Beltran CBA just as if those provisions existed at the time of execution.

The language of Article 7 is not ambiguous in the sense that it is not susceptible to more than one meaning, and neither party argues that it is. Rather, the operative language of Article 7 of the Beltran CBA is clear in its meaning as is the language used in the KBW CBA that pertains to its geographical reach. And nothing in the language in Article 7 suggests that the parties did not intend that the geographical reach of the KBW CBA could not be viewed by Beltran as a "favorable" term. To the contrary, the language used by the Plaintiff in drafting Article 7 adds to and significantly expands the class of possible "favorable" terms. Those "favorable" terms are not limited to just "lower wages, [and] longer hours", but also include "any terms and conditions more favorable to a Signatory Employer".

Beltran claims that the KBW CBA is more favorable to it, and there is no argument from Plaintiff that it is not. But though there is no dispute of the favorability of some of the terms of the KBW CBA, there is still the matter of interpretation of the CBAs and whether Beltran's obligations to make contributions is changed by the KBW CBA. *In re Southwest Airlines Voucher Litigation*, 898 F.3d 740, 743–44 (C.A.7 (Ill.), 2018). (When the facts are undisputed, contract interpretation is a legal question.)

One of the central provisions is Article 45 of the Beltran CBA. Article 45 provides as follows:

> *The contributions required by this Article shall accrue with respect to all hours worked by any Employee represented by the Union, or by any person doing work within the jurisdiction of the Union.* Said contributions shall accrue with

> respect to all hours worked by Employees, covered by the terms of this Agreement within or outside the geographical jurisdiction of the Union, except that when work is performed outside the Union's jurisdiction where another fringe benefit fund of a similar kind exists and the Employer makes contributions to that fund, then said Employer shall not be required to make a contribution to this fund.
>
> Emphasis added.

It is alleged that Beltran conducted work outside Illinois and Missouri utilizing a number of individuals who were then employees or non-signatory subcontractors, and for whom no contributions were made to Plaintiffs or a sister union. Beltran does not contest these allegations. (See Defendant's Responses to Material Facts at Doc. 41, ¶¶ 17, 18, 19, and 23) Plaintiffs argue too that Article 45 imposes upon Beltran the obligation to make contributions whether the work is performed within or without the territorial jurisdiction of the Union. (Doc. 39, p. 14). Beltran does contest, however, that any contributions were required because the most-favored-nation terms of Article 7 of the Beltran CBA and Article 3 of the KBW CBA relieve it of any obligation to make contributions for work done outside the territorial boundaries established by Article 3. (See Defendant's Responses to Material Facts at Doc. 41, ¶¶ 2, 10, 11, 12, 13, 14, 15, 16, 17, 24, and 25)

Interpretation starts by a return to Article 45 which says: "[t]he contributions required by this Article shall accrue with respect to all hours worked by any Employee represented by the Union, or by any person doing work within the jurisdiction of the Union." The Court views the word "or" as used in that sentence as a coordinating conjunction, functioning as a disjunctive, in that it links the different possibilities of when

contributions are required to be made. Thus, accrual of contributions necessarily occurs in either instance of the work being performed by a union-represented employee or by any person within the jurisdiction. The former alternative does not require that the work be done within a specific territorial jurisdiction to be counted toward accrual. This presents a problem for Beltran because Article 3 of the KBW CAB speaks only to territorial jurisdiction and thereby alters only those provisions in the Beltran CBA relative to territorial jurisdiction. Article 3 does not concern Union-represented employees and, therefore, it does not modify the Beltran CBA so as to change the status of such employees. It follows that Beltran must make contributions for Beltran *employees* represented by the Union regardless of where their work is being performed, as well for any for any *person* doing work within the jurisdiction of the union regardless of if that person is union-represented.

Some may observe that Article 45 and Article 7 of the Beltran CBA and Article 3 of the KBW CBA may seem to have a mutual conflict in the sense that the territorial reach of the KBA agreement nullifies the operation of Article 7. However, as indicated, Article 7 and Article 3 harmoniously ensure that no contributions to these Plaintiffs are required so long as the person working is not represented by Local #2 and the work is done outside the jurisdiction as established in Article 3.

Importantly, this construction of the two CBAs also leaves its provisions in harmony. For example, Beltran CBA prohibits its "members from contracting or sub-contracting, any roofing work." (Doc. 38-19, p. 41) To construe the CBA provisions as Defendant suggests would have the effect of divesting members of Local #2 of their

representation if they contract with Beltran outside of the City of St. Louis or the several counties in Illinois and Missouri. *Henderson v. Roadway Exp.*, 720 N.E.2d 1108, 1111, 242 Ill.Dec. 153, 156, 308 Ill.App.3d 546, 549 (Ill.App. 4 Dist.,1999) ("Also, when possible, courts should construe a contract so that different provisions are harmonized and not conflicting with one another.") There is nothing in either agreement to suggest that the parties sought to achieve such a goal from Article 7 or Article 3. And, since the court should construe agreements toward harmony amongst its terms, those provisions are reconcilable if the CBA is interpreted in a way that allows Beltran to do work outside the covered areas in Illinois and Missouri without having to make contributions to Plaintiff so long as those working are not represented by Local #2

The Court finds that the Beltran CBA, even after the integration of Article 3 of the KBW CBA, required Beltran to make certain contributions to Plaintiffs relative to work done outside the enumerated Illinois and Missouri Counties and the City of St. Louis whenever the work in question was performed by employees represented by the Union unless the required contributions have been made to a sister Union whose jurisdiction included the geographical area where the work was performed.

Having interpreted the CBAs, there remain the issues concerning breach, liquidated damages, interest and related actual damages.

B. Beltran's Required Contributions:

Plaintiff had a payroll examination conducted of Beltran's books and records and purportedly uncovered that it failed to pay $39,101.64 in contributions for work that

Beltran performed on a project in Los Angeles, California. Defendant did not pay those contributions claiming none were owing because the work was done outside the territorial limits of the KBW CBA. However, as noted, Article 45 of the Beltran CBA still required that contributions be made regardless of where the work was performed unless a sister union's similar fringe benefit plan received the contributions. And, according to the CBA, Articles 12 and 13, which are identical in both CBAs, require that the contributions be made on the basis of the accepted wage scales. [3]

Jesus Beltran testified that he did not enter into a CBA with any other local union for the Los Angeles project, even though that project was within the jurisdiction of Roofers Local 36. (Doc. 38-6, P. 31-34 Jesus Beltran Depo). Defendant offers no evidence that he paid fringe benefits contributions to any other benefit fund for the work performed there. And, significantly, the payroll examination revealed found that $39,101.64 is owed in contribution as a result of the Los Angeles work (Doc. 39-3)

In his declaration, Jesus Beltran indicates that it was his "understanding" the Beltran was not required to make contributions under its agreement with Local #2. (Doc. 41-2). However, [w]hether one intentionally, carelessly, or innocently breaches a contract, he is still considered in breach of that contract, and will be liable to the extent that the

[3] Article 13 provides that : [i]n all cases where Employees are sent or are dispatched by Employer to supervise or perform work outside the territorial jurisdiction of the Union…, and said job site is within the territorial jurisdiction of any other sister local union of the Union herein, then, and in such event, the minimum hourly wage scale to be paid by the Employer to Employees dispatched outside of this jurisdiction for such work shall be either the regular working hourly wage scale for similar work in such geographical area, or the regular hourly wage scale provided for in this Agreement, whichever is greater.

other party must be placed in the position he would have been in absent the breach." *Wait v First Midwet Bank/Danville*, 142 Ill App. 3d 703, 710 (Ill. App. 4th Dist., 1986)

Plaintiff also contends that Beltran utilized employees and "non-signatory" subcontractors, and, according to the audit, paid them as subcontractors for work done between April 17, 2019 and February 28, 2022. (Doc. 39, p. 17; Romolo Aff.¶. 30) According to Plaintiff, Beltran failed to pay the Roofers Funds a total of $712,617.47 but instead included those amounts in the subcontractor's paychecks. There is no apparent dispute that the payments were not for material or equipment but were, instead, solely payments for roofing labor. (Doc. 39, p. 18).

Still, Beltran claims that the payments were made for work completed outside the territory of Local #2 and claims "contracts produced to Plaintiffs and contained in exhibits 3 and 4 of Plaintiff's Motion for Summary Judgment indicate numerous projects outside of the territory contained in Article 3" of the Beltran CBA. (Doc. 41, p. 27) However, there are two distinct reasons why Beltran's argument fails. First, Article 43 specifically considers the "practice of sub-contracting the labor or contracts to employees or non-signatory contractor or individuals for the purpose of defeating the wage scale" a violation of the CBA. Relatedly, the Beltran CBA discloses that the Union prohibits its "members from contracting or sub-contracting, any roofing work." (Doc. 38-19, p. 41) But, as Jesus Beltran points out in his Declaration (Doc. 41-2), Beltran "subcontracted" with several individuals to perform roofing work. At least one of these individuals, Marco Gutierrez, was at the time a member of Local #2. (Doc. 38-15, 38-13 and 38-14). Second, as Plaintiff points out, Beltran produced no records, emails, texts or other evidence to

suggest whether the subcontracting work is permitted under the CBAs or where the subcontracting work was performed. In fact, Jesus Beltran could not recall the specific locations of these projects. (Doc. 39, p. 19). Moreover, exhibits 3 and 4 (Doc. 38-7 and Doc. 38-8 respectively) were reviewed during examination by Nick Romolo and he observed that Exhibits refer only various contractors and do not contain any information pertaining to the individual subcontractor payments. (Doc. 38-3, p. 4) He further observed that Exhibits 3 and 4 do not explain the purpose or location of the projects. Doc. 39, p. 19) And, importantly, Beltran offers nothing to demonstrate the labor was conducted by signatory subcontractors consistent with the wage scale. Without some proof to demonstrate that the work was done outside the jurisdiction of Local #2 by non-member employees, there is no question that Beltran would not succeed at trial.

ERISA, specifically 29 U.S.C. § 1059(a)(1), requires that every employer "maintain records with respect to each of his employees sufficient to determine the benefits due or which may become due to such employees". Instructive here is *Illinois Conference of Teamsters and Employers Welfare Fund v. Steve Gilbert Trucking*, 71 F3d 1361 (7th, 1995) The district court determined that once the Fund showed liability and provided a calculation of the damages it suffered, the burden shifted to the employer to come forward with documentary evidence to dispute the methodology of calculation. On appeal, the Court indicated that the employer had disputed the amounts calculated by the Fund's auditor and claimed that he had paid year-end bonuses that were recorded as regular income, although he did not pay his employees union scale wages. The 7th Circuit reversed the district court's grant of summary judgment in favor of the Fund. The employer there

maintained and offered records such that the calculations were contested by affidavit. The Court found that the affidavit of the employer created a material issue of fact that precluded summary judgment.

*Steve Gilbert Trucking* demonstrates what a Union employer is required to bring forward to defeat a summary judgment motion. But, here, only documentary proof addressed by Beltran is a number of contracts identifying different jobs that it claims are for work conducted at unknown places outside the territorial boundaries called for in the Beltran CBA and the KBW CBA. (Doc. 41, p. 27) But the sub-contracts do not reveal how much the employees and any sub-contractors were paid, such that there is no effort on Beltran's part to demonstrate the money paid that should be excluded from contribution calculation or whether the money paid comported with applicable wage scale. Unlike the employer in *Steve Gilbert Trucking*, Beltran provides neither affidavit nor testimony that calls into question the accuracy of the auditor's assessments and calculations. Further, Beltran does not point to any document or evidence to support its contention that the work occurred outside the territorial jurisdiction of the Union. Beltran failed to comply with its duties under 29 U.S.C. § 1059(a)(1). It likewise fails to bring forth reliable evidence to create an issue of fact.

One other point regarding Beltran's argument that the existence of the contracts for work (Doc. 38-7 and 38-8) creates an issue of fact that precludes summary judgment. Beltran makes these bald assertions, but it does not develop or expand on why those contracts operate to prevent summary judgment. It only asserts that work was performed outside of the territory of the Union. (Doc. 41, p. 27) However, "[t]he mere existence of

an alleged factual dispute will not defeat a summary judgment motion; instead, the nonmovant must present definite, competent evidence in rebuttal." *Butts v. Aurora Health Care, Inc.*, 387 F.3d 921, 924 (7th Cir. 2004). The little offered by Beltran, even if presented to a jury, would not alter the outcome of this case. As such Beltran cannot defeat Plaintiffs' summary judgment motion.

C. Liquidated Damages

The Beltran CBA provides the following regarding liquidated damages: "In the event the Funds refer any delinquent contributions to an attorney for collection, . . .the Employer shall also be liable for . . . liquidated damages in the amount of twenty percent (20%), and any and all remedies to which the Funds would be entitled under the Employee Retirement Income Security Act." (Doc. 38-19) ( See also Hamilton Aff. Exh. 1, ¶ 12 ) A search of the document does not reveal any definition or even further mention of the term "liquidated".

While the Court finds that the Plaintiffs are entitled to their respective actual damages, interest, costs of payroll examination and attorneys' fees by the terms of the CBA, the basis for recovery of liquidated damages is not clear from the record. In fact, neither party addresses the question of whether Plaintiffs are entitled to liquidated damages at all, let alone in addition to actual damages. Typically, the purpose of liquidated damages is to provide an agreed-upon measure of damages when calculation of any actual damage is anticipated to be difficult or uncertain. As noted above, Defendant does not contest the accuracy of the calculation of the actual damages, and by

the Plaintiffs' Motion and supporting exhibits, there is no contention on Plaintiffs' part that there is any uncertainty in the actual damages suffered or the lack of difficulty in determining those damages. Thus, the question arises as to whether the Plaintiffs' claim for both actual and liquidated damages is sustainable under Illinois law.

While "[t]here is no fixed rule applicable to all liquidated-damages agreements, and each one must be evaluated on its own facts and circumstances", Illinois Courts have employed factors to help in the process. *Jameson Realty Group v. Kostiner,* 813 N.E.2d 1124, 1130, 286 Ill.Dec. 431, 437, 351 Ill.App.3d 416, 423 (Ill.App. 1 Dist.,2004) Specifically, to validate a liquidated damages clause, a determination must be made as to whether: "(1) the parties intended to agree in advance to the settlement of damages that might arise from the breach; (2) the amount of liquidated damages was reasonable at the time of contracting, bearing some relation to the damages which might be sustained; and (3) actual damages would be uncertain in amount and difficult to prove. " *Id*. Here, plaintiff advances no discussion regarding any of these factors. Thus, the Court is left without any argument or evidence to suggest that the parties agreed on the settlement of damages or that the amount contemplated as liquidated damages was reasonably related to anticipated but indeterminate damages. At the same time, the record does provide evidence that suggests liquidated damages would be inappropriate.

Here, the contributions that should have been made by Defendant to Plaintiffs are supported by audit and affidavit. Plaintiff proffered the Affidavit of Nick Romolo who outlines his experience in conducting payroll audits, the basis for his calculations of fringe benefits that should have been but were not appropriately contributed, and the specific

amount of those required contributions. (Doc. 38-3) Likewise, Plaintiff presents the affidavit of Mike Theirl who points to specific amounts of contributions that were required to be paid but were not. (Doc. 38-2, ¶ 13) Defendant does not contest the accuracy of these calculations. Given that the actual damages are calculated with certainty and without any apparent difficulty, it follows that liquidated damages are not properly a part of recovery due to Plaintiffs. See *NAR Business Park, LLC v Ozark Automotive Distributors, LLC*, 430 F. Supp. 3d 443(NDIL, 2019) (actual damages must be uncertain and difficult to prove before liquidated damages are permitted to be recovered.)

## Conclusion

The Court is aware that when it is considering a motion for summary judgment, it must "construe all facts and reasonable inferences in favor of the nonmoving party." *Citizens for Appropriate Rural Roads v. Foxx*, 815 F.3d 1068, 1074 (7th Cir. 2016). In doing so here, the Court finds that the Plaintiffs are entitled to summary judgment in their favor and against Beltran Contractors, LLC. It further finds that Plaintiffs are entitled to damages in the amount of $753,250.96 for unpaid contributions, $98,703.39 in interest through April 24, 2026 (See Doc. 38-2, ¶ 12) and $14,142.79 in payroll examination fees. Judgment will be entered in favor of the Plaintiffs and against Beltran Contractors, LLC for the sum of $866,097.14, subject to additional judgment for attorneys' fees, costs and any additional interest between April 24, 2026, and August 16, 2026.

As to attorneys' fees and costs, Plaintiffs' Counsel shall file their submission for attorneys' fees by August 31, 2026, which shall include the attorneys' fees claimed to have

been incurred, the amounts of attorneys' fees paid to date, Counsel's hourly rate, and costs incurred, all of which shall be supported by affidavit. Defendant shall file any objections to the Counsel's filings regarding attorneys' fees and costs on or before September 15, 2026.

## DISPOSITION

For all the above stated reasons, Plaintiff's Motion for Summary Judgment (Doc. 41) **GRANTED.** Judgment is entered in favor of the Plaintiffs and against Beltran Contractors, LLC for the sum of $866,097.14, subject to additional judgment for attorneys' fees, costs and any additional interest between April 24, 2026, and August 14, 2026.

**SO ORDERED.**

Dated: August 16, 2026

Judge Dugan

Digitally signed by Judge Dugan
Date: 2026.08.16 11:44:45 -05'00'

DAVID W. DUGAN
United States District Judge